First case up this afternoon is 412-0507 CMS v. ILRB. For the appellant is Lawrence A. Weiner. For the appellee is Melissa Auerbach. You'll be arguing 13 minutes. And Valerie Quinn, you'll be arguing 7. Is that correct? Okay. Mr. Weiner, you may proceed, sir. May it please the court. It is always a privilege to occur in court. This case involves the hearing officers at the Department of Health and Family Services. There was a previous case involving the Department of Health and Family Services cited by this court in 2009. And that's the case primarily relied upon, actually, by the appellees in this case. And in that case, in dicta at page 337 of 388 Illinois Act III, this court made the announcement that while, quote, the attorneys in the Bureau of Administrative Litigation are expected to be advocates, the attorneys in the Office of General Counsel are expected to be impartial decision makers. The integrity of the adversary system demands a rigorous segregation of those two functions. And when they were referring back to that, who they were, they were the administrative law judges and hearing referees that have to be impartial. Are you talking about our prior decision in this case? No. You're talking about Pollution Control Board? No, I'm talking about a case that was decided in 2009 where they were dealing with attorneys who were declared to be advocates in the Bureau. What's the name of the case, Mr. Weiner? As they all are named, it's the Department of Management, Central Management Services versus the Illinois Labor Relations Board. And it's at 388 Illinois Act III, 319. And the quote that I have is at 336-37. The court was distinguishing the functions of administrative law judges and hearing officers from attorneys who are advocates. And that distinguishing characteristic is determinative in this case because it's admitted, and I'm quoting from the state's brief, these ALJs are impartial, independent hearing officers. And what the ALJs do here is that they conduct vendor hearings in which a medical provider is at risk of recoupment and termination for overbilling the program or suspension and termination from the program for providing poor quality care to patients. And that also came from the state's briefing, pages 13 and 14, as well as this one quote, and then I'll go into analysis. But at page 28 and 29 of the state's briefing, I'm quoting, one aspect of the department's mission is to ensure the provision of high quality medical goods and services to public aid recipients by reimbursing vendors and health care providers for the goods and care they provide those recipients. Where vendors and providers overbill, fraudulently bill, or fail to provide high quality goods and services, the department's OIG may investigate and bring charges against those providers. The three petition for ALJs in the Bureau spend the bulk of their time hearing and adjudicating those cases. So they are judges. They are to be impartial judges. And in this case, they are impartial judges. And so it devolves down to an analysis of whether they're managerial employees under the definition of the Act. Mr. Weiner, you filed a motion to cite authority to this court. Yes, I did. I just said it's one of the more recent cases, Your Honor. That was a case decided in January that you wanted to cite to us. Right. And I had thought it was in the briefs, but we filed the briefs before that case was decided. And in reviewing, preparing for the argument, I noticed that that case was cited. Go ahead. The other important fact is that their determinations are accepted 90 to 95 percent of the time. 90 to 95 percent of the time. So they are fulfilling the mission of DHFS in this area. And the litmus test, the litmus test, as set forth in the ICC case, are their recommendations, their recommended decisions and orders, are they effective? Are they accepted? And in this case, just as in ICC, where it was 95 percent, and in other cases where we have those same kinds of figures, these recommendations meet the litmus test established in the ICC case of 90 to 95 percent of the time. Now, in the briefs of the state and the union, they have basically resurrected a number of standards that have been rejected by this court in several of its opinions. Primarily, and I'm quoting from the AFSCME brief, AFSCME cites that, quote, it is the final responsibility and independent authority to establish and effectuate policy that determines managerial status under the Act. That the responsibility to establish or formulate policy as being a factor is okay, but as a criteria for determination has been rejected by this court. And it was actually, it was rejected in Yeshiva, it was rejected in all of the cases, state's attorneys, public guardians, public defenders, the case I cited, other cases involving DHFS relied upon that language. But this court has clarified that you don't have to formulate policy in order to be determined to have managerial status under the Act, nor do you have that final responsibility to do that. And yet we keep getting these kinds of analysis. Those are contained on the state's brief at pages 17, 37, 27, et cetera. But always it has to be formulate and effectuate, using the and, which Yeshiva didn't use the and, it used or there, and other cases have recognized that standard. So both the state and the union, the union at page 27 of their brief relies upon, 26, I mean, of their brief, and state of 27 contains those standards. At the very least, this case should be remanded for an application of the standards as established in ICC and the subsequent cases of this court. We have one employee, who we believe had supervisory status. We recognize there were some limits on his actual performance. We believe that he had the authority to engage in the discipline, and also there were several aspects of the discipline that he actually engaged in. One obviously being the monitoring of the work assignments. I think that's undisputed that he did that, and he did that for a substantial amount of his time. He also prepared the first draft of evaluations, and again those were subject to supervisory review, but he did do that work. Primarily he monitored and assigned work basically on a place available basis, but he actually once assigned did monitor those under the PSA Option 2 case. That is one of the criteria, whether one monitors subordinates' work, and also one evaluates employees' work, and he did those unquestionably. He also would train people if they had hired new people. He would have been the trainer of those people, and that's I believe an undisputed testimony. So we would contend that Mr. Perlack was a supervisor, but primarily we are relying upon the managerial arguments made, and for the rest of those arguments I would rely upon our own. Thank you, Counsel. Ms. Auerbach. May it please the Court, I'm Melissa Auerbach. I represent Respondent AFSCME Council 31. At issue in this case is whether the Board clearly erred in finding that three employees who are ALJs, they were previously called hearing officers or hearings referees, at the Department of Health Care and Family Services are eligible for collective bargaining. The Board found that under the factual record before it, and this was a factual record created after remand from this Court with orders for the Board to issue an order to show cause, the Board did that, the ALJ did that, and then held a hearing, and the Board found on the basis of the factual record that CMS had not proven that the three ALJs are either managerial or that the one, Mr. Curielack, is supervisor. Are there different types of ALJs in state government? The title is, a lot of them previously were called something else. There are, it's fact-based. There's no automatic exclusion of the act for ALJs, so the exclusion here argued is managerial. I would note that, I guess the answer is yes, to the extent that it's fact-based as to what they do. This Court, I think, and some others have held that some ALJs were managerial people. Some were, right. So we have to do this on a case-by-case basis involving each such ALJ? Yes, because it's, CMS in its brief to this Court at page 11 concedes that they are not arguing managerial as a matter of law in this issue, in this case, and the only issue is... Why did they do that? Why did they do that? Yes. I assume because they didn't feel there was an argument that they're managerial as a matter of law, and so CMS has conceded in its brief that the only issue before this Court is whether the ALJs are managerial under the traditional fact-based standard, it has to be determined based on a factual record whether people are managerial or not. There is no broad exclusion in the act for administrative law judges. And I would note, with respect to counsel's suggestion of a remand for the Board to consider this Court's decision in the ICC case, the ICC decision issued by this Court was before the Board's hearing on remand in this case, and the Board adopted its ALJ's decision, which extensively discusses this Court's decision involving the ICC ALJs at pages 10 to 16 of the ALJ recommended decision, which was adopted by the Board. And going through the detailed factual record distinguished the facts in that case, as found by this Court, from the facts in this case before the Board, based on the fact that here the ALJs work in a small office, which is a subset of a larger agency. The records show that these ALJs carry out defined functions. They work in the medical vendor hearing section, which is one section of the Bureau of Administrative Hearings. The other section, the affair hearing section, also has hearing officers who have been represented for some time by AFSCME. Those are non-attorney hearing officers, but they also function as impartial hearing officers, hold hearings, and write recommended decisions, and they've been represented for some time, and there's no argument that they're managerial. The Bureau of Administrative Hearings is itself a bureau in the Office of the General Counsel, which is an office within the agency. So these employees hold hearings within one part of carrying out the function of a larger state agency. I would note with respect to counsel's reference today to a prior decision involving DHFS, these employees at issue here were not at issue in that case. The attorneys who were also public service administrator Option 8Ls in that case were attorneys in the Office of the Inspector General, and they are currently represented by another union. This court affirmed the board certification, finding that those attorneys are not managerial, and in the general discussion of the functions of the agency mentioned these other employees, but there was no fact-finding as to those employees at that time. In this case, there was a fact-finding, and the board found that these employees conduct hearings in vendor cases, mostly involving vendors seeking to challenge a denial of application or a suspension or discharge from providing services under the Medicaid program. The vast majority of the cases are default, but the evidence showed that the default ones and the few that go to long decisions are all subject to several layers of review, including by the Chief L.J. Lipinski who testified that she conducts in-depth reviews of all of the decisions and that they don't leave the Bureau until she's done her in-depth review and she testified that she asks for changes in two or three out of five of the long decisions, which are the ones that result from an actual hearing. With respect to the default decisions, the evidence showed that the ALJs are given by office management to set language to include in the decisions which they are required to include and that the ones that do go to a hearing are subject to several layers of review before they even get up to the Director's Office, so that the Director's Office doesn't even see the initial draft that's written by an ALJ here, because it's already been substantively reviewed and modified before it even leaves the Bureau under the signature of the Chief ALJ, not the ALJ who did the initial draft. The Chief ALJ forwards them out of the Bureau after she's done her reviews and changes and then the Director's designee does another in-depth review. She testified that she'd even gone back and listened to recordings of the hearings to verify whether certain evidence was or wasn't there and does another in-depth review to make sure that any final decision issued by the Director is what she thinks is appropriate and what the Director would think is appropriate. The record also showed that the General Counsel's Office does not consider the drafts, decisions written by the ALJs, to be something owned by them, but rather to be a compilation of their initial draft and two levels of review and decision-making that make it a recommended decision of the Bureau and not of the ALJ. The Board analyzed this and said that given this rigorous review process and the multiple layers of review before any decision goes out and the changes along the way, meant that these ALJs are not, to use the words of this Court in the ICC decision, these ALJs are not the whole game when it comes to carrying out the mission of DHFS as an agency, that rather they have defined duties, that they are attorneys, so they're professionals, they do professional work including legal research and drafting, but that they don't have any effective recommendation in terms of management of the agency as this Court articulated that standard in the case involving the ICC ALJs. And so based on this factual record, the Board did not clearly err in finding that the work that these ALJs do does not rise to the level of policy formulation or even policy recommendation, that they write their decisions in a fairly rigid system of rules and checks and balances in line with established policy, and that their draft decisions do not implement or direct the implementation of policy because they go through several layers of substantive review. With respect to the supervisory status of Mr. Kurilek, the Board found that any prior authority he had, whether or not that was supervisory, he didn't have anymore, that he doesn't currently have any authority to discipline grant time off, that his review of decisions is just a first level, and he can't even talk to one of the two ALJs about his review, and that he really didn't have any authority to exercise any indication of supervisory authority, and therefore didn't spend preponderance of his time doing that. So based on the factual record, CMS had the burden of showing by preponderance of the evidence that the facts support the exclusions it asserted, and the Board, based on its consideration of the factual record, found that in this case, that neither the manager exclusion or the supervisory exclusion were proven, and that therefore the employees were properly included within the bargaining unit, and we would ask that that decision be affirmed. Thank you, Counsel. Ms. Quinn? Deciding who's a manager, who's a supervisor, those are necessary... Speak up a little bit. Resolving the question, who's a manager, who's a supervisor, that is necessarily a fact-based question, and as the Court knows, the Board's factual findings are reviewed for manifest weight of the evidence, which means that the Court would have to conclude that no rational fact finder could have found as the Board did. We've done that before with regard to the AARB. The Board's application of law to those findings is reviewed for clear error, which is not as deferential as standard, but it's still significantly so, because this Court would have to be left with the definite and firm conviction that a mistake has been made, and there was no mistake made here, Your Honor. These ALJs are professional employees. They exercise their skill as attorneys to apply the law to the facts of the cases before them, but everything they do, as the Court has heard, is subject to multiple layers of review and subject to substantial revision. Unlike the ALJs at the Human Rights Commission, never do these ALJs issue a final decision that goes out without modification, and that makes them dissimilar to the ALJs at the ICC as well. How about the law clerks who work for the Pollution Control Board? Well, they're different there, too. For one thing, the members of the Pollution Control Board are not themselves attorneys, so they have these clerks who function basically as elbow clerks to advise and to guide them. That's a strange argument to make to an appellate court filled with lawyers who employ lawyers. Why would the fact that if we weren't lawyers that would make a difference? No. What I was getting at is the relationship is a lot more collaborative and advisory, and the Pollution Control Board members are able to be persuaded. They rely probably more on the advice of their ALJs, whereas here the upper management at DHFS is not looking to be persuaded by these ALJs. These people do not have influence over their supervisors. They're kind of expected to keep their heads down and to work within their own narrow purview and to issue drafts that conform to the expectations of their superiors. It's very much a hierarchy with authority from the top. The ALJs in this case do not have discretion even within the drafting decisions. They've kind of learned not to display any initiative. We cite one example in our brief, but something else that struck me in the record was where McNew Clark was basically publicly castigated in a director's final administrative decision for noting a successor and liability issue, as the director put it, on her own initiative. That's in the record in Volume 6, page 400. Actually the parties had raised it during the proceedings, but the astonishing part is the way she was kind of called out as if she were a maverick for doing what any responsible adjudicator would have done, which is to ensure that only the wrongdoers appearing before her were punished. It's not a collegial collaborative environment like one gets the sense the Pollution Control Board is. This is not a situation particularly striking, I thought, was this court's language in ICC where the court described the recommended decisions if the only change to them would be to the title and the addition of the chairman's signature, as they were in the ICC. What about Mr. Winder's argument that the decision that these people reach is the decision rendered, I think his figure was something like 95% of the time? It is only accepted by the director 90 to 95% of the time because it's been worked over and modified at the various levels that it goes through before it gets there. But even then, it's not a guarantee that it's going to be accepted. Some of them have been reversed, and there are examples in the record of that. That's what makes it so different from the ICC and the HRC. These witnesses testified there's nothing ever that they do that goes out without modification, and that's the big difference here. And these ALJs do not make or modify policy. They are following existing policy. So on this record, we would submit that these ALJs are neither supervisory nor managerial, and that the board's decision should be confirmed. Thank you, counsel. Mr. Winder? The undisputed evidence at the hearing shows that I can't hear you, Mr. Winder. The undisputed evidence at the hearing establishes that Fisher, one of the ALJs, testified he drafts his recommended decision in order to be a, quote, persuasive document, and then over the last several years, the supervising ALJ and chief ALJ have made, quote, very few, close quote, changes to his draft RDOs. Similarly, ALJ McNeil Clark testified that in 15 years of service as a DHFS ALJ, she only drafted two RDOs where her ultimate conclusions were not accepted by the director. That's a transcript 205, 230, 232. The other one was a transcript 184, 189, 190. These are by the petition for employees themselves. More evidence. Despite the interplay that occurs between the DHFA ALJs, the supervising ALJs, and the chief ALJs during the review process, the deputy chief, Mr. Lee, testified that disagreements over the draft RDOs are grammatical, stylistic, or involve different interpretations of the administrative code. In addition, chief ALJ Lipinski admitted that he has never changed a DHFS ALJ's substantive conclusion in a recommended decision in order, and that Dale Cohn testified that where the respondent has filed exceptions to the DHFS ALJ's RD, the director has affirmed 95% of the time. Lastly, on a different note. Did you abandon the managerial employee as a matter of law argument? Of course. There's no statutory grounding to establish the facts necessary for, in my opinion, for review under that standard. And where there is none, we're obviously then reverted to getting facts at the oral hearing instead of just considering the law without any fact-finding. In other words, the law itself has sufficient facts to support the exclusion. Whereas, if it doesn't, which I believe in this case, it goes into the analysis under the traditional test as a matter of fact. Lastly, again, we heard from the union that there's no independent, basically, review. There's a ladder of review. Again, this court has held in the PSA Option 2 case. However, at the paragraph 187, however, exclusivity in the implementation of management policy is not a requirement under that Act. Again, in the same section, the fact that these employees do not do so independently is unimportant, given that the Act does not require such independence in management functions. We're again reverting back to outdated and inapplicable standards of interpretation, which is really what's at issue in this case. Thank you. Thank you, Counsel. We'll take this matter under advisement and be in recess for a few moments.